(67 App. Div. 297.)

LONERGAN et al. v. ERIE R. CO.

(Supreme Court, Appellate Division, Fourth Department. December 3, 1901.)

1. RAILROADS — CROSSING OTHER TRACKS — COLLISION — DEFECTIVE SIGNALS — ELIMINATING QUESTION FROM CASE.

The tracks of two railroad companies crossed at right angles, and plaintiff's intestate, an engineer employed by a company having arrangements for the use of one of such tracks, was killed in a collision with a train operated by the defendant, which had the use of the other. A safety device was maintained by the railroads owning the tracks, whereby a white light was shown when the crossing was safe, and a red light when it was unsafe. *Held*, that defendant's objection that the accident was due to defects in the device, whereby the safety signal was improperly given, and that the action should have been against the railroads maintaining the device, was untenable on appeal, where the trial court ruled repeatedly that the action could not be maintained unless the danger signal was shown, thereby eliminating the defense based on the defective device from the case, and holding, in effect, that defendant had a right to make the crossing if it received a safety signal, whether or not it was given because of defects in the device.

2. SAME — FAILURE TO STOP — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY.

A railroad engineer killed in a collision with a train operated by another company at a crossing of the two tracks is not, as a matter of law, guilty of such contributory negligence as to bar a recovery because of his failure to stop before making the crossing, as required by the railroad law (Laws 1898, c. 466); but the presumption of negligence raised thereby may be rebutted, so as to make the question one of fact for the jury.

3. SAME — PROXIMATE CAUSE.

The failure of a railroad engineer to stop before crossing the tracks of another company, as required by the railroad law (Laws 1898, c. 466), cannot be regarded as the proximate cause of a resulting collision, so as to preclude a recovery for his death, as a matter of law, merely because he might not have been on the crossing in time for the collision if he had stopped.

**4. SAME—QUESTION FOR JURY.**

A railroad engineer killed in a collision with the train of another company at the crossing of the two tracks failed to stop before making the crossing, as required by the railroad law (Laws 1898, c. 466). Within the limits wherein he could have made the stop he was proceeding not faster than 4 miles per hour, and his engine could have been stopped within 3 or 4 feet, so that the time lost in stopping would have been slight, and easily made up before reaching the crossing. *Held* not to show, as a matter of law, that the collision would have been avoided had the engineer stopped as required by law.

**5. SAME—FAILURE TO SEE OTHER TRAIN.**

A railroad engineer, killed in a collision with another company's train at the crossing of the two tracks, who had received a signal from the watch tower that the crossing was safe,—the other train not being in sight at the time,—cannot be charged, as a matter of law, with the duty of keeping a vigilant watch for trains on the other track, but has a prima facie right to rely on the signals.

**6. SAME—KNOWLEDGE OF APPROACH OF OTHER TRAIN—EFFECT.**

A railroad engineer, killed in a collision with another company's train at the crossing of the two tracks, had received a signal from the watch tower that the crossing was safe. The latter's engineer testified that as he approached the tower he slowed down to 2 or 3 miles per hour, and from there to the crossing was not going faster than 7 miles per hour. There was evidence that his train, going at that rate, could have been stopped in 10 feet, and that, going 10 miles per hour, it could have been stopped in 30 feet. One of the parties riding in the engine, and inexperienced in railroad matters, testified that he did not expect a collision until the other train was within 50 feet of the crossing, and that just as he called to the engineer the latter opened his engine, and endeavored to get by and avoid the collision. *Held* not to show contributory negligence in the engineer, as a matter of law, even though he saw the train approaching the crossing, as he might have assumed that it intended to stop.

**7. SAME—COLOR BLINDNESS—WITHDRAWING QUESTION FROM JURY.**

In an action for damages resulting from a collision between two railroad trains at the crossing of their tracks, defendant's engineer testified that he received the white signal, indicating that the crossing was safe, and that he remarked to his fireman that it was "On the white," and that the fireman answered back, "On the white." He stated that he was not color-blind, but merely asked the fireman as an extra precaution. Plaintiff's counsel subjected him to a rigid color test by means of a lead pencil, to which he responded with perfect readiness and correctly. *Held* error to refuse a charge that there was no evidence on which the jury could find that the engineer was color-blind.

**8. SAME—DISREGARDING EVIDENCE.**

In an action for damages resulting from a collision of two railroad trains at the crossing of their tracks, where a witness for defendant testified that its train received a white signal, indicating that the crossing was safe, it was error to disregard his testimony on the ground that he might have mistaken the white signal concededly given the other train as the signal given to defendant.

Appeal from trial term, Erie county.

Action for negligently killing plaintiff's intestate by Catherine Lonergan and others, as administrators of William Lonergan, deceased, against the Erie Railroad Company. Judgment for plaintiffs, and defendant appeals. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Adelbert Moot, for appellant.

John Laughlin, for respondents.

HISCOCK, J. A short distance outside of the city of Buffalo double tracks owned by the Buffalo Creek Railroad Company and by the New York, Lackawanna & Western Railroad Company, respectively, cross each other nearly at right angles; the tracks of the former company running in a somewhat northerly and southerly direction, and those of the latter company in an easterly and westerly direction. Under some arrangement which does not very definitely appear in this case, and which is immaterial, the tracks of the former company are used by, amongst others, the defendant, Erie Railroad Company, for its trains, and the tracks of the New York, Lackawanna & Western Railroad Company are used by the Delaware, Lackawanna & Western Railroad Company. It does not appear what the relationship of these last two named companies is, but upon the face of the record they are entirely distinct corporations. At the northwest angle formed by the tracks aforesaid is situated a tower house, from which signals are given to trains upon each of the two roads mentioned approaching the crossing in question. This house was erected and is operated under an arrangement between the Buffalo Creek Railroad Company and the New York, Lackawanna & Western Railroad Company, whereby the former hires and pays the operator, but the latter company repays the former company such expense. Upon the side of said tower house towards each of said railroads at the time of the occurrences in question was a set of signals, consisting of red and white disks attached to different ends of the same arm or appliance, and so arranged that when the red disk was in, out of sight, the white disk would show, and vice versa. The white disk was the signal of safety to a train approaching the crossing, and authorized it to cross the tracks of the other road. The red disk was a danger signal, and, when shown to a train approaching upon either road, was a signal to it to stop before reaching the crossing. The signals were so arranged that, if working properly, the red signal would always show until the operator in the tower pulled it in and held it, allowing the white signal to then show. Plaintiffs' intestate was an engineer in the employ of the Delaware, Lackawanna & Western Railroad Company; and upon the morning of December 22, 1899, he was proceeding from East Buffalo to Buffalo, going westerly upon the northerly track used by said company towards the crossing in question, and backing with his engine. His fireman and one or two other people were on the engine with him. As he approached the crossing in question, it is claimed by plaintiffs, and seems to be conceded by defendant, that he received the white signal of safety to make the crossing. At the same time one of defendant's passenger trains was approaching said crossing from the northerly direction. It is a hotly-disputed question in this case whether the engineer of said train received from the tower house a white signal to make the crossing, or a red signal to stop before making it; it being claimed by the defendant that the former was the case, and by the plaintiffs that the latter was true. However this may be, the intestate upon his engine approached the crossing without making any full stop, running at a speed estimated from 8 miles an hour down to 4 miles; and the passenger train likewise approached the crossing without making any stop, using steam, and

proceeding at a rate estimated at from 2 or 3 to 18 or 20 miles an hour. From the time that the intestate came within several hundred feet of the crossing, he could, if he had looked, have seen the defendant's passenger train, if within a distance of perhaps 300 feet from the crossing, the extent of his vision increasing as he neared the latter; and, likewise, if he had looked in that direction, there was nothing to prevent the engineer of the passenger train from seeing the approach of the engine operated by intestate within the distances above mentioned. When the intestate had proceeded with his engine so that the tender was within a few feet of the track upon which defendant's passenger train was approaching, he seems to have realized for the first time the danger of a collision; and he put his engine in full steam, hoping to get across, with the result that it cleared the track, except for about 6 feet. Defendant's train, however, struck the engine, tipped it over, and caused the intestate's death.

Independent of the claims based upon the facts above outlined, various contentions were predicated upon the provision of what is known as the "Railroad Law," which requires that:

"All trains and locomotives on railroads crossing each other at grade shall come to a full stop before crossing, not less than two hundred or more than eight hundred feet from the crossing, and shall then cross only when the way is clear and upon a signal from a watchman stationed at the crossing." Chapter 466, Laws 1898.

Concededly, neither engine came to a full stop.

Plaintiffs' claim of negligence upon the part of the defendant is entirely or mainly based upon the theory that defendant's train did not have the white signal of safety for a crossing, but had the red signal of danger for a stop; that its servants disregarded such signal, and negligently caused the accident. In addition to disputing these facts, defendant undertook to avoid the force of this contention by claiming, in substance, that the signals in the tower house worked imperfectly, and also that the New York, Lackawanna & Western Railroad Company was responsible for the operation of this tower house, and that this action should have been brought against it; and various exceptions were taken to the disposition of these claims by the trial justice. We think, however, that the question of defendant's negligence was very carefully and properly submitted to the jury. The trial justice accorded to defendant all the rights to which it could possibly be entitled when he held and ruled, as he did repeatedly, that the plaintiff could not recover in this case unless the jury should find that the signal to defendant's train was the one of danger, and against its making the crossing. This, of course, took out of the case any claim based upon alleged imperfections of the tower house, because it was, in effect, ruled that, if the engineer of the passenger train had the safety signal, he had a right to proceed, and that it made no difference whether he obtained such signal from the affirmative act of the signalman, or from some imperfection in the tower.

It was seriously urged upon the trial, and has been upon this appeal, that plaintiffs' intestate was, as matter of law, guilty of contributory negligence in approaching and going on the crossing when

he saw or could have seen the approach of the passenger train, and especially that he was guilty of such negligence for having violated the provision of the statute requiring him to come to a stop. Although we have concluded that the judgment appealed from must be reversed upon other grounds, and that their decision, therefore, is not necessary to a determination of this appeal, we deem it proper to consider the above defenses, which will probably determine the final disposition of this case. We shall take them up in the inverse order of their definition as above.

The intestate did not obey the statute telling him to stop between the points of 200 and 800 feet of the crossing. Does that, as matter of law, bar the plaintiffs' recovery? We think not. The statute does not by its terms make a person disobeying its provisions so guilty of negligence, or otherwise obnoxious to the law, that he cannot recover for injuries resulting under such circumstances as attended intestate's death. The principle is well settled, therefore, that, while the disobedience may create a presumption of negligence here, such presumption may be so rebutted by all of the circumstances as to make it a question of fact to be determined by the jury whether the violation did in fact cause or contribute to the accident complained of. Blanchard v. Steamboat Co., 59 N. Y. 292; Hoffman v. Ferry Co., 68 N. Y. 385; Id., 47 N. Y. 176, 7 Am. Rep. 435; Minerly v. Ferry Co., 56 Hun, 113, 9 N. Y. Supp. 104; Railway Co. v. Snyder, 117 Ill. 376, 7 N. E. 604. This was the view taken and acted upon—as we think, correctly—by the learned trial justice, and which we think must govern upon the facts of this case as they now appear. It may be urged that, if intestate had come to a full stop with his engine, he would not have had time to get in front of defendant's train, and therefore that there can be no question that his failure to observe the statute did contribute to the accident. In our opinion, the jury had the right to find that intestate got the white signal of safety about a quarter of a mile from the crossing, and thereafter had it all the while; that he could have made a reasonable compliance with the statute by stopping at least within from 400 to 600 feet away from the crossing, wherefrom he could have had a view of defendant's track and any train thereon for a distance of from 300 to 400 feet northerly of the crossing; that he had the same view without stopping; and that, as matter of fact, defendant's train did not come within the space of vision upon its track above specified, so that intestate could see it, either stopping or moving, while within the points of observation of 400 to 600 feet, above stated. Under such circumstances, if it be assumed that if intestate had stopped he would not have got upon the crossing in time for a collision, we still do not think that the temporary and accidental location of the engine on the crossing as a result of a mere loss of time in stopping should be regarded as such a proximate, natural, and contemplated result of the failure to obey the statute as would settle in the affirmative the proposition that in a legal sense the failure to stop caused the accident. The essential object of the statute was to compel those in charge of trains making the crossing to devote more attention and give greater care to the performance of the act in safety, not to regulate the instant of doing it. If, through fail-

ure to observe its provisions and stop, an engineer concededly failed to see and came into collision with an approaching train, which by stopping he would have seen and avoided, the accident would manifestly be a proximate and natural result of his disobedience. If, on the other hand, an engineer, able without fully stopping to guard with his eyes an intersecting railroad, and accomplish the purpose pointed out by the statute, of seeing that the crossing was clear, should be run down by another train upon that track, which, as matter of fact, he could not have seen if he had stopped and looked, we do not think he should be barred from recovery, as matter of law, simply because, as an accidental result of his stopping, he might not have got on the crossing in time for a collision. The purpose of the statute is to make an engineer more careful and certain that the crossing is clear. Independent of that, it is not designed to affect the time of his getting on the crossing. If his disobedience has defeated the substantial purpose of the statute, and prevented him from seeing what he otherwise would have seen, then it may well be said that he has contributed to the injury; otherwise we think not. This view seems to be sustained in some of the cases cited supra. In Minerly v. Ferry Co., plaintiff's ferryboat was injured by a collision with one of defendant's. There was evidence that the former was violating a statute which prescribed its course in the river and its rate of speed, and it was urged that, because of this violation, plaintiff, as matter of law, could not recover. The court, however, say in answer to this contention:

"Evidence was offered * ·* * from which a jury might possibly have inferred that the violations of the statute which were established by the evidence in no manner contributed to the happening of the accident, except the mere fact that by the violation of the statute the plaintiff was in the position in which he was. But, even if he was in that position in consequence of his violation of the statute, this gave no right to the other boats in the river to run him down. He had made himself liable to the penalties prescribed by the statute, and had also made himself liable in case of accident to the presumption that the accident had arisen because of his violation of the requirements of the statute, and these were the only burdens which such violation imposed upon him."

In Hoffman v. Ferry Co., 47 N. Y. 176, 7 Am. Rep. 435, cited above, it was held that although a party, while violating a statute, is placed in the position and situation where he receives his injuries, such violation does not bar a recovery, unless it is a proximate and directly contributing cause of the accident in some other respect than the merely incidental one of physical location. See, also, same case as reported in 68 N. Y. 385.

We are unwilling to hold, however, as matter of law, the assumption, heretofore made for the sake of argument, that, if intestate had brought his engine to a stop within the limits prescribed by the statute before reaching the crossing, he would have necessarily avoided the collision. There is evidence that before reaching the bridge over the Buffalo creek, and within the limits where he might have made a stop, he was proceeding at a rate not exceeding four miles an hour; that his engine might have been stopped within three or four feet; and that the net loss of time by reason of such stoppage would not have exceeded a small fraction of a moment. It might

very well have happened that in starting his engine after such stop-
page, and proceeding the several hundred feet before reaching the
crossing, he would have made up the loss of time occasioned by a
full stop.  With the break in his course caused by a stop, it might
have happened that he would so change his rate of speed, voluntari-
ly or involuntarily, as to more than counterbalance the small loss of
time.  His course and rate of progress with such an interruption
must be a matter of more or less conjecture and speculation.  We
think that, even if this question were decisive upon this branch of
the case, it would be for the jury to say as matter of fact, rather than
for the court to say as matter of law, whether a compliance with
the statute in the particular specified would have so changed and
delayed his progress that he would not have got to the crossing in
time to have a collision.

We pass to the consideration of the other defense urged,—that,
independent of the statute, plaintiffs' intestate was guilty of con-
tributory negligence, as a matter of law,—and which contention,
also, we are unable to adopt.  The intestate received the white sig-
nal of safety, which a jury might find said to him, in substance, that
the crossing was clear for him; that he had the right of way, and
that, under the practice observed, the red signal of danger was
out against any train approaching as did defendant's; and that such
train would be stopped before reaching the crossing.  At the time
he received this signal, defendant's train was not within his sight.
Under these circumstances, we do not think that the intestate was
charged, as a matter of law, with the duty of keeping a vigilant watch
and lookout for trains approaching upon the Erie track, but that
he had the right prima facie to presume that he could rely upon the
signals, and that the latter would not only govern in permitting him
to proceed over the crossing, but also in preventing any other ap-
proaching train from interfering with his safe passage thereover.
The practice and understanding of engineers as governing the cross-
ing is set forth in the testimony of defendant's engineer upon the
train in question.  He testified:

"After we get the target, and call or give the signal that we have got the
target, we then understand we have the right of way, and don't look out for
anybody on the crossing ourselves.  That is what our time-table says,—not
to proceed until the white block gives you the right of way.  When we do
get it, and we answer we have got it, and it still remains there, we then
have the right of way, as I understand it, and we do not have to look out for
anybody else."

As the intestate approached the crossing, he was on the opposite
side of the engine from the defendant's train; and while it was prob-
ably possible for him, over and across the boiler, to see the defend-
ant's train, this must have required some effort.  There is evidence
that just before he reached the crossing he was leaning out of the
cab window upon his side of the engine, looking down the Lack-
awanna tracks towards the crossing in question.  We think the
jury might say this conduct and position were not improper.

Again, however, if we assume that the intestate did watch or
should have watched, did see or should have seen, the Erie train as
it approached the crossing, we still think his conduct presented a
question of fact for the jury.  Remembering that he had the white

signal, which told him that he had the right of way as against the Erie train, he would have seen the latter approaching; and a jury would have the right to find that he might assume that the red signal was out, telling it to stop before it came to the crossing. While there is evidence that the train approached the point of collision at the rate of 18 or 20 miles per hour, there is other evidence, furnished by the engineer of that train himself, that as he came down towards the target post he slowed down to the rate of 2 or 3 miles per hour, and that from there on as he approached the crossing he was going at the rate only of from 5 to 7 miles an hour. There is other evidence that his train, going at that rate of speed, might have been stopped in 10 feet, and that, if going at the rate of 10 miles an hour, might have been stopped in a distance of 30 feet. Upon this evidence, until defendant's train came very close to the crossing there was nothing to tell the intestate conclusively that the defendant's engineer did not intend to obey the danger signal in time to give him a safe passage over the crossing. A jury might give intestate credit for believing that the defendant's engineer, knowing that the signal was out against him, was approaching the crossing at this slow rate of speed with his train under perfect and almost instantaneous control, expecting that intestate's engine would get across in time to give him a chance to cross without bringing his train to an absolute stop; and while a jury might say, as matter of fact, that his practice was so dangerous that it should have admonished intestate to stop and avoid the possibility of a collision, we do not think that this is to be held as conclusive in law. Plaintiffs' witness Ranney, who was riding upon the engine, and who was upon the side directly towards the Erie train, and who had nothing else to do than to watch it, did not expect a collision until the Erie train had come within about 50 feet of the crossing. As he says:

"That was the first time, as we came along there, that I realized that the Erie was not going to stop before striking us. When I called to the engineer [intestate] was the same instant that he opened her wide open. Up to that time I had expected that she was going to stop before reaching our track."

This witness was a man not inexperienced in railroad matters, and the impression produced upon his mind by the approaching Erie train is entitled to some weight in determining the course of conduct which intestate might legitimately pursue. It was at this instant that he opened his engine, and endeavored by accelerating its speed to clear the crossing. If we are correct in our reasoning that he was not guilty of negligence in getting into the position that he then occupied, it was not negligence for him, as matter of law, to endeavor to escape from the emergent danger by doing as he did. The plaintiffs would be entitled to have a jury weigh his conduct in this respect. Some evidence bearing upon these questions was introduced, in the form of rules of the railroad company requiring its engineers to come to a stop before reaching a crossing. We do not think that such rules, upon their face, present any considerations outside of those already discussed in connection with the statutory provision. In addition to this, a practical construction seems to have been placed upon them by the conduct of the employés of the railroad, with the acquiescence of its officers, which exempted the

former from a rigid compliance with the provision requiring engineers to come to a full stop.

While the case was thus, in our judgment, properly submitted to the jury in a most careful manner by the trial justice upon the main issues, we think that he fell into error in refusing to charge the jury as requested by defendant's counsel upon two or three specific points and features of the case, and that these errors must lead to a new trial. As stated before, the question whether defendant's train received the red or the white signal was vigorously contested upon the trial. The towerman testified in behalf of plaintiffs that he gave the danger signal. Five witnesses upon the part of the defendant (three of them being employés) gave evidence tending to prove that defendant's train received the white signal, which entitled it to go ahead over the crossing. Each party endeavored to support its theory by reference to some facts outside of the mere statements of these witnesses. Defendant's engineer in charge of the train testified that as he approached he saw the white signal, and that he remarked to his fireman, referring thereto, that it was "On the white," and that his fireman answered back, "On the white." Plaintiffs predicated a theory upon this evidence that defendant's engineer was color-blind, and that this foregoing remark was a question addressed to his fireman for the purpose of removing any doubt or uncertainty in his own mind, and ascertaining whether he was correct. The engineer, however, testified positively that there was no trouble with his sight; that what he said was not a question addressed to his fireman, but that it was his usual custom, simply as a matter of extra precaution, to call his signal to the fireman, and have the fireman call it back to him. All of these facts appeared by the evidence of the engineer himself. Thus the same witness who testified that he did call this signal to the fireman gave at the same time in connection with it the explanation of why he did it. And there was nothing in his evidence to impugn his statement that he was not color-blind. In addition to this, upon the trial the plaintiffs' counsel subjected him to a color test by means of a lead pencil, which appears to have been quite severe, and to which the witness seems to have responded with perfect readiness, and concededly correctly. In the body of his charge the learned trial justice referred to the respective claims of the parties with reference to this engineer's capacity for detecting color, squarely leaving it to the jury to determine which of the parties was right in reference to it. Afterwards he was requested by the defendant's counsel to charge the jury "that in view of the color tests that the counsel submitted the engineer to in their presence with his own red lead pencil, in a poor light, and the other evidence given here by all the witnesses, there is no foundation on which they can find that the engineer of the Erie was color-blind"; and this request was refused. We think this was an error. Upon reading the record with care, which, of course, it was not possible for the trial justice to do in disposing of the case and the request to charge, we do not think that what took place between the engineer and his fireman would fairly warrant a jury in finding that he was asking for the color of the target because he was color-blind or uncertain what it was, but that the fair context of what was said

indicates that, as claimed by him, the signal was being called back and forth simply as a matter of extra precaution. In addition to that, we have the evidence, drawn out by plaintiffs' counsel upon the trial, indicating that there was no trouble with his eyesight. We think that, upon all of this evidence, it would be improper to allow a jury to find that the man was color-blind, and could not tell the color of the signal. Under some circumstances, in view of the admirable manner in which the case was submitted, upon its main issues, to the jury, we might be able to overlook the inadvertence of this particular ruling. But in this case we cannot say that it may not have been a source of serious injury to the defendant. In the conflict which sprang up over the character of the signal which was given, the two men who were especially charged with the duty of observing and knowing what that signal was were the towerman, who was sworn in behalf of plaintiff, and the engineer, who was sworn in behalf of defendant. The latter, above all of the witnesses who were sworn in behalf of the defense, was responsible for knowing the character of and obeying the signal which was given upon this occasion; and if the jury were allowed, without adequate evidence, to dispose of his testimony upon the theory that he could not tell the color of the signal, defendant was deprived of the evidence of one of its most important witnesses. We also think that in permitting the jury to disregard the evidence of the defendant's witness Davis, who testified upon this same question, upon the theory that he may have made a mistake in observing the signals, and may have seen the Lackawanna signal when he thought he was looking at that given the Erie train, the trial justice again misapprehended, or failed to recollect with entire correctness and distinctness, the testimony. We are unable to find any evidence which would entitle a jury to disregard Mr. Davis' testimony because he had mistaken the one set of signals for the other. The refusal of the trial justice to rule as requested on these questions very easily may have been a source of harm to defendant. It is the duty of a jury, of course, to reconcile the conflicting evidence of witnesses, if possible, without finding that any of them have committed deliberate perjury. Naturally a jury would prefer to do this. Still a party is entitled to have the jury squarely pass upon the credibility of its witnesses, rather than have their evidence avoided upon some theory not authorized by the evidence, and which perhaps makes it much easier to overlook and find against their testimony than it would be to definitely and distinctly meet and adversely pass upon the question whether they have intentionally stated a falsehood. We think, therefore, that the judgment and order appealed from must be reversed, and a new trial granted, with costs to appellant to abide event.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event.

SPRING, J., concurs. ADAMS, P. J., concurs in result, in separate opinion, in which McLENNAN, J., concurs. WILLIAMS, J., concurs in result on ground of errors in charge and contributory negligence.

ADAMS, P. J. (concurring). I agree that the judgment and order in this case should be reversed, and a new trial ordered, but prefer to rest my conclusion upon the ground that the plaintiffs'.intestate, as matter of law, was guilty of contributory negligence.

On the 22d day of December, 1900, when the accident in question occurred, a statute was in existence in this state which required that:

"All trains and locomotives on railroads crossing each other at grade shall come to a full stop before crossing, not less than two hundred or more than eight hundred feet from the crossing, and shall then cross only when the way is clear and upon a signal from a watchman stationed at the crossing." Chapter 466, Laws 1898, amending chapter 565, Laws 1890, commonly known as the "Railroad Law."

It is conceded that this statute was not regarded by Lonergan, the plaintiffs' intestate. On the contrary, it is established by indisputable evidence that, instead of coming to a dead stop, he proceeded with his engine towards the crossing of the defendant's road at a rate of speed of not less than four miles an hour, and probably as great as six or eight, and that his engine was struck within six feet of the rear end of the tender by the defendant's engine, which was attempting to make the crossing at the same time. This fact demonstrates beyond all question that, if Lonergan had obeyed the statute, he would not have reached the crossing until after the defendant's train had passed over it. It is true that a white target was exhibited from the signal tower at the crossing, which indicated that the way was clear for Lonergan to make the crossing; but this did not absolve him from the necessity of obeying the statute, and taking such other precautions as were reasonable to protect himself from just such an accident as followed. McGrath v. Railroad Co., 59 N. Y. 468, 17 Am. Rep. 305. In other words, he had no right to regard the exhibition of a white target as an absolute assurance of safety, which would justify him in disregarding the statute and closing his eyes to his surroundings; for the signal given might have been the result of a mistake upon the part of the watchman, or, as the evidence tended to prove was the fact in this case, because the apparatus in the signal tower was out of order. Now, it may be conceded that in one sense a violation of this statutory requirement is not per se a bar to the plaintiffs' recovery, but that it is simply a circumstance to be considered in ascertaining the proximate cause of the accident which resulted in the death of the plaintiffs' intestate. This, however, as I understand it, is the rule only where evidence is given which tends to show that the accident was caused solely by the wrongful or negligent act of the persons in charge of the colliding train. Blanchard v. Steamboat Co., 59 N. Y. 292; Hoffman v. Ferry Co., 68 N. Y. 385. Such, however, is not the case here. It may be assumed that the negligence of the engineer of the defendant's train contributed to bring about the collision; but it cannot be said, in the circumstances of this case, that it was the "sole" cause thereof, for, as has already been stated, it may. be fairly inferred, even if it be not absolutely demonstrated, that if the statute had been obeyed there would have been no collision. The object of this statute is to guard as far as possible against just such results as here occurred, and we think its proper observance

requires an engineer not only to stop within the prescribed distance of such a crossing as the one in question, but also to approach the same with caution and with his engine under absolute control. No other interpretation will satisfy the requirements of the statute, or furnish to the public the protection which it was designed to afford. But, again, it is an undisputed fact that the train on the defendant's road, which was approaching at the rate of about 18 miles an hour, was in plain sight of the plaintiff's interstate for a considerable time before his engine reached the crossing, and, had he taken the slightest precaution to cast his eye in the direction from which that rain was coming, he could not have failed to observe it in time to have avoided the collision.

For these reasons, it seems to me it was clearly the duty of the trial justice to have nonsuited the plaintiffs, and that his refusal so to do was error which requires a reversal of the judgment and order appealed from.

McLENNAN, J., concurs.